## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

EDWARD JASON FREED,       *

Plaintiff           *

v.                 *       Civil Action No. CCB-19-599

TYRONE HERNDON, *et al*.,[1]  *

Defendants        *
                  ***

### MEMORANDUM OPINION

In response to the above-titled civil rights complaint, Defendants Master Trooper Tyrone W. Herndon and Corporal Francis E. Shanks ("the Troopers"), filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. ECF 23. Plaintiff was notified of his right to file an opposition response (ECF 25), but did not do so. Defendant Michael Ortman filed a Motion to Dismiss. ECF 28. Plaintiff was notified of his right to respond (ECF 29), requested and received an extension of time to do so (ECF 30 and 31), and in response to the Motion filed a Motion to Amend his Complaint. ECF 32. The court finds a hearing in this matter unnecessary. *See* Local Rule 105.6. For the reasons that follow, the Troopers' motion, construed as a Motion for Summary Judgment, will be granted in part and denied in part. Ortman's motion to dismiss will be granted. Plaintiff's motion to amend will be granted in part and denied in part.

### Background

A.  Plaintiff's Allegations

In his verified Second Amended Complaint, Plaintiff Edward Jason Freed alleges that on February 27, 2016, he called the police because he had been assaulted by Brenda Curry. ECF 17, p. 2. The Havre de Grace police responded but Freed declined to press charges and the police advised him to call if he had further problems. *Id*., pp. 2–3.

---

[1] The Clerk shall amend the docket to reflect the correct names of Defendants.

The following day, Curry threatened Freed with a knife. Freed recorded the threat on his phone and called 911. *Id*., p. 3. Freed waited outside for police to arrive and was in view of a surveillance camera attached to a shop nearby. *Id*. After at least 45 minutes had passed, state police arrived. *Id*. Freed advised the responding officers that he was the 911 caller who had been threatened with a knife and that his assailant was inside the trailer. *Id*.

Trooper Herndon went inside to speak with Curry while Freed explained to Shanks that he had been assaulted the day before by Curry but declined to press charges due to their familial relationship. *Id*., p. 4. Freed told Shanks that he had recorded Curry's threats on his phone. *Id*. Shanks advised Freed to request a restraining order and declined to review the video. *Id*., pp. 4–5.

After speaking with Curry, Herndon left the trailer and spoke with Shanks. *Id*. They asked Freed if he knew about a peace order, but Freed denied having any knowledge of it because it had not been served. *Id*., p. 5. Herndon told Shanks that "she's the victim" and pointed toward the trailer. *Id*. Freed expressed his dissatisfaction with the Troopers and their focus on the peace order rather than on his 911 call. *Id*., pp. 5–7. Herndon then rushed aggressively toward Freed, stopping inches from his face, yelling and spitting in his face saying, "You better stop yelling right now I'm talking to you right now, you need to calm down, I'm not going to tell you no more." *Id*., p. 7. Freed states that this was the only time he was told to calm down and that he responded to Herndon by stating the he was not "un-calm." *Id*.

Freed, who had been recording his interaction with the officers the entire time, stepped back, revealing that he was videorecording the exchange. *Id*., p. 8. Freed then spoke to his phone, while it recorded, again expressing his dissatisfaction with his encounter with the Troopers. *Id*., p. 8. Herndon then attacked him "without need or provocation using his handcuffs as a weapon, striking [Freed] with the handcuffs." *Id*. Freed questioned why he was being assaulted and shouted

2

that he was not resisting. *Id*., p. 9. Herndon continued striking Freed, knocking him to the ground, at which point Shanks joined Herndon, striking Freed with his fists and pulling Freed's arms. *Id*.

Freed yelled that he had an injured shoulder and could not be handcuffed from behind. *Id*., p. 9. The Troopers turned Freed over and handcuffed him in front. *Id*. Herndon asked where Freed's phone was. Freed told him it was somewhere in the grass and also explained that he had no respect for anyone that beat a person who was not fighting back. *Id*., p. 9. Herndon responded by pulling Freed by his shirt to his feet saying, "you're going to respect this badge" and walked Freed toward the police vehicle. *Id*., p. 10. Herndon grabbed Freed by his hair and slammed his head repeatedly into the police vehicle. *Id*. Freed states that he was not resisting and was in handcuffs. *Id*. He then suffered a seizure. *Id*. When he regained consciousness, he was on his back on the ground, confused as to what happened. *Id*. Herndon advised that an ambulance was on the way. *Id*. The ambulance took Freed to Upper Chesapeake Medical Center where he was admitted. *Id*., p. 11. Freed states that prior to the incident he did not have a history of seizures. *Id*. He was "diagnosed and treated for new onset seizure and concussion . . . ." *Id*. Herndon returned to the hospital, served Freed with charging documents, and threatened Freed not to do anything with the video of the encounter. *Id*.

After Freed was discharged from the hospital he filed a complaint against Herndon and Shanks. ECF 17, p. 12. A few days later he received a call from Michael Ortman, who informed Freed that he was an investigator with the State's Attorney's Office and was working on Freed's complaint regarding the Troopers. *Id*. Ortman asked Freed whether he had evidence of the assault and Freed advised that he had his cell phone video, the recording of the 911 call, and a surveillance video from the shop near the scene. *Id*., pp. 12–13. Freed claims that Ortman recovered the video from the shop, but after viewing it, only provided Freed with a partial video, stopping the video

3

before the assault. *Id.*, p. 13. Ortman never reviewed Freed's cellphone video. Later, Freed was advised that the State's Attorney's office declined to charge the officers. *Id.*

As a result of the incident, Freed states that he suffers from seizures. *Id.*, p. 13. He claims that Shanks' and Herndon's conduct amounted to excessive use of force in violation of the Eighth Amendment. *Id.*, pp. 13, 15. He alleges Shanks failed to protect him from harm. *Id.*, p. 13. He also claims that Shanks and Herndon's actions constituted assault and battery under Maryland state law. *Id.*, pp. 14, 15. Freed further contends that the Troopers' failure to investigate his claims of assault by Curry constituted denial of equal protection and due process. *Id.*, pp. 14, 16. He also claims that the Troopers' refusal to allow him to express his feelings, opinions, and criticisms regarding how he was treated by the police, without fear of retaliation, violated his rights under the First Amendment. *Id.*, pp. 15–16. Lastly, Freed claims that Ortman's failure to properly investigate his claims of assault violated his right to Equal Protection and Due Process. *Id.*, pp. 16–17.

B.  Herndon's and Shanks' Response

The Troopers' version of events differs from Freed's. Herndon and Shanks state that they responded to Freed's 911 call. ECF 23-2, p. 3 ¶ 2 (Shanks Decl.). Herndon talked to Curry while Shanks talked to Freed. *Id.*, ¶ 3. Freed had recently been released from jail and Curry allowed him and his wife to stay with her because they had nowhere else to go. ECF 23-3, p. 3, ¶ 4 (Herndon Decl.). Curry explained that the couple was only supposed to stay with her for three days but had been there for almost two months. *Id.* Curry was afraid of Freed and felt like a prisoner in her home. *Id.*, ¶ 5. The day before the incident, Curry applied for a peace order. *Id.*, ¶ 6. The peace order was granted but Curry remained fearful while she waited for the order to be served. *Id.* When Curry told Freed about the order, which required Freed and his wife to vacate Curry's home, he became upset and yelled at her. *Id.*, ¶¶ 7, 9.

After speaking with Curry, the Troopers determined that she had not threatened Freed with a knife but rather took the knife to her room to protect herself from Freed, who had become increasingly agitated. ECF 23-3, p. 3, ¶ 8. The Troopers determined that Curry's peace order was valid but Freed had not yet been served. *Id*., ¶ 9. They advised Freed that Curry's conduct did not warrant any further police action; Freed expressed that he was upset that he placed the 911 call and now was perceived as the subject of the police action. ECF 23-2, p. 3, ¶¶ 6, 7; ECF 23-3, p. 4, ¶¶ 11, 13.

Freed became louder and accused the Troopers of not doing their job and the Troopers ordered Freed to keep his voice down. *Id*.; ECF 23-3, pp. 3,4, ¶¶ 8, 12, 14. The Troopers noted that Freed's conduct had caused neighbors to observe the situation, and they requested he calm down. ECF 23-2, p. 2, ¶ 9; ECF 23-3, p. 4, ¶¶ 12–15. Freed raised his voice again, using profanity, and as a result was told he was under arrest. ECF 23-2, pp. 3–4, ¶¶ 10, 12; ECF 23-3, p. 4, ¶¶ 16-17.

Herndon informed Freed that he was under arrest for failure to obey and for disorderly conduct and directed Freed to place his hands behind his back, but Freed refused. ECF 23-2, p. 4, ¶ 13; ECF 23-3, p. 4, ¶ 17. In order to arrest Freed, Herndon reached for Freed's arm, but Freed yanked away and he and Herndon fell to the ground. ECF 23-3, p. 4, ¶ 17. Shanks reports that he used a "foot sweeping maneuver to get Freed to the ground," which caused Freed and Herndon to fall. ECF 23-2, p. 4, ¶ 14. While on the ground, Freed would not place his arms behind his back and Shanks "used a muscling technique to get his arms behind his back." *Id*., ¶ 15. While held by Herndon, Freed swung his arms and legs wildly and Herndon struck Freed in the torso in order to gain compliance. ECF 23-3, p. 5, ¶ 19. The Troopers each deny striking Freed with their handcuffs. ECF 23-3, p. 5, ¶ 20; ECF 23-2, p. 4, ¶ 16. After Freed was subdued, and due to his report of a

prior shoulder injury, the Troopers complied with Freed's request to be handcuffed in the front of his body. *Id*.

Herndon escorted Freed to the passenger side of the police vehicle while Shanks went to the driver's side to unlock the doors. ECF 23-2, p. 5, ¶ 17; ECF 23-3, p. 5, ¶ 21. While waiting for the vehicle to be unlocked, Freed suddenly fell to the ground convulsing. ECF 23-2, p. 5, ¶¶ 17, 18; ECF 23-3, p. 5, ¶ 22. Freed's head was not slammed into the vehicle. *Id*. When he fell his face hit the ground and he suffered cuts to his forehead. ECF 23-3, p. 5, ¶ 23. When Freed recovered from the episode, the Troopers sat him in a chair and waited for the ambulance that had been called by Shanks. ECF 23-2, p. 5, ¶18, 19; ECF 23-3, p. 6, ¶ 24. Freed told the Troopers that he had a history of seizures but was not taking his anti-seizure medication. ECF 23-2, p. 5, ¶ 20; ECF 23-3, p.6, ¶ 25. He was taken the hospital. ECF 23-2, p. 5, ¶ 21; ECF 23-3, p. 6, ¶ 26.

Freed was charged with Disorderly Conduct, Failure to Obey the Lawful Order of a Law Enforcement Officer, and Resisting Arrest. He was convicted in the District Court of Maryland for Harford County of Failure to Obey the Lawful Order of a Law Enforcement Officer and Resisting Arrest, and was acquitted of the Disorderly Conduct charge. *State v. Freed*, Case No. 4R00104962 (Dist. Ct. Harford Cnty.); ECF 23-4. Freed appealed his conviction to the Circuit Court for Harford County where after a trial *de novo*, he was again convicted of Failure to Obey the Lawful Order of a Law Enforcement Office but acquitted of Resisting Arrest. *State v. Freed*, Case No. 12K16000682 (Cir. Ct. Harford Cnty.); ECF 23-5.

C.  Motion to Amend

In his Motion to Amend (ECF 32), Freed seeks to amend the complaint to add claims against Ortman for conspiracy to deprive him of his civil rights and for negligence in failing to properly investigate Freed's allegations. ECF 32, p. 1.

He also alleges that Shanks and Herndon's conduct constituted excessive force in violation the Fourth Amendment.[2] *Id.*, p. 2. He further alleges that Shanks conspired to use excessive force and failed to intervene to prevent the use of excessive force. *Id.*, p. 2.

The Motion to Amend shall be granted to the extent it seeks to clarify that Freed's excessive force claims are brought under the Fourth rather than the Eighth Amendment and denied to the extent it seeks to add conspiracy and negligence claims. A Motion to Amend is governed by Fed. R. Civ. P. 15(a) which provides that "[a] party may amend its pleading once as a matter of course within [] 21 days after serving it, or [] if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Rule 15 dictates that "[t]he court should freely give leave when justice so requires." *Id.* Where, as here, the proposed amendment to the complaint to add conspiracy and negligence claims appears to be futile, the court has the discretion to deny leave to amend.

1. Conspiracy

To establish a civil conspiracy under § 1983, Freed must present evidence that Ortman "acted jointly in concert and that some overt act was done in furtherance of the conspiracy, which resulted in [] deprivation of a constitutional right." *See Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). An essential element for a claim of conspiracy to deprive plaintiff of a constitutional right is an agreement to do so among the alleged co-conspirators. *See Hafner v. Brown*, 983 F.2d 570, 576 n.6 (4th Cir. 1992). Freed must allege facts that plausibly establish that Ortman shared with another person a "unity of purpose or a common design" to injure him. *Am.*

---

[2] Freed, who is self-represented, erroneously identified the Eighth Amendment as the basis for his Complaint. Defendants correctly note that the Eighth Amendment does not apply in the context of an arrest. *Bell v. Wolfish*, 441 U.S. 520, 535, n. 16 (1979). Any claims alleged under the Eighth Amendment are dismissed.

*Tobacco Co. v. United States*, 328 U.S. 781, 809–10 (1946). Freed asserts that Ortman's "failure to properly perform his duties as an investigator" of Freed's claims constitutes a conspiracy, (ECF 32, p. 1), but his amended complaint contains no factual allegations that would support an inference that Ortman entered into an agreement with another person to violate Freed's rights. He has therefore failed to state a claim of civil conspiracy.

2.   Negligence

An amendment of Freed's complaint to include a state law negligence claim against Ortman for failure to investigate would be futile as well. The Maryland Tort Claims Act (MTCA) immunizes State personnel from liability in tort *unless* the tortious conduct is not within the scope of the public duties of the State personnel or is made with malice or gross negligence. Md. Code Ann., State Gov't § 12-104 (cross referencing Md. Code Ann., Cts. & Jud. Proc. § 5-522(a)(4)). Freed's allegations against Ortman include no facts which plausibly permit an inference that Ortman acted intentionally or with gross negligence, defined as "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another." *Cooper v. Rodriguez*, 443 Md. 680, 708 (2015) (quoting *Barbre v. Pope*, 402 Md. 157, 187 (2007)). Viewed in the light most favorable to Freed, Ortman's alleged actions could be characterized, at worst, as a half-hearted investigation into Freed's claims; they cannot conceivably be deemed gross negligence. Thus, Freed's negligence claim is barred by the MTCA.[3]

D.  Motions to Dismiss and for Summary Judgment

1.   Standard of Review

Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court considers only the complaint and any attached documents "integral to the

---

[3] Nor is negligence by state officials actionable under the Fourteenth Amendment. *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986).

complaint." *Sec'y of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). To the extent that grounds for dismissal are based solely on the contents of the complaint, the court may dismiss under Rule 12(b)(6) if the complaint does not allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Rule 12(d) requires courts to treat a Rule 12(b)(6) motion as a motion for summary judgment when matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* A "reasonable opportunity" means: (1) the nonmoving party must have some indication that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted). Here, the notice requirement has been satisfied by the title of the Troopers' Motion and by the court's notice to Freed of his rights and responsibilities with respect to the Motion. *See* ECF 29; *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975). To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d) explaining why "for specified reasons, it cannot present facts

essential to justify its opposition," Fed. R. Civ. P. 56(d), or otherwise put the court on notice of the reasons why summary judgment is premature, *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244–45 (4th Cir. 2002). Here, Freed has not filed a Rule 56(d) affidavit, requested discovery in this matter, or otherwise objected that summary judgment is premature. Under these circumstances, the court will construe the Troopers' Motion as a Motion for Summary Judgment.

Under Federal Rule of Civil Procedure 56, the court will grant summary judgment if the moving party demonstrates there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). "However, a verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

Once the moving party carries its initial burden to demonstrate the absence of a genuine issue of material fact, the nonmoving party has the burden to show that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248–49.

2. Analysis

Freed's operative complaint (ECF 17) asserts claims against the Troopers and Ortman in their individual capacities.[4] The court addresses each claim in turn.

i. Equal Protection

Freed's claims that his rights to equal protection were violated by Ortman's failure to properly investigate his claims against the Troopers and the Troopers' alleged failure to investigate his claims against Curry are without merit. In order to sustain this claim, Freed must demonstrate "that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). If he were to make such a showing, the court would then "proceed[] to determine whether the disparity in treatment c[ould] be justified under the requisite level of scrutiny." *Id.* Here, Freed fails to allege how he was treated differently than other similarly situated individuals and does not allege any facts from which the court could infer that any of the named Defendants' conduct was the result of discrimination. Freed has failed to allege any discriminatory purpose associated with any of the Defendants' actions; as such, this claim is dismissed.

ii. Due Process

Freed's due process claim also fails. Freed has no legally protected interest in the investigation of any alleged offense. *Sattler v. Johnson,* 857 F.2d 224, 227 (4th Cir. 1988) (holding members of the public do not have an enforceable right to have crimes investigated); *Walker v. Schmoke,* 962 F. Supp. 732, 733 (D. Md. 1997) (same). Accordingly, any failure by Ortman or the

---

[4] To the extent that any of Freed's claims are made against the Troopers or Ortman in their official capacities, those claims are, as Ortman argues (ECF 28-1, pp. 3–5), barred by the Eleventh Amendment.

Troopers to investigate Freed's complaints, as he alleges, does not state a cognizable due process claim.

### iii. Excessive Force

Claims brought under 42 U.S.C. § 1983 alleging the use of excessive force in effectuating an arrest or other seizure are governed by the Fourth Amendment's prohibition against "unreasonable" seizures. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). The question of reasonableness is "wholly objective . . . without regard to [an officer's] own subjective intent or motivation. Subjectively bad intentions on the part of the individual officer will not make a constitutional violation out of an otherwise reasonable seizure; nor will subjectively good intentions render an objectively unreasonable seizure constitutional." *Martin v. Gentile*, 849 F.2d 863, 869 (4th Cir. 1988) (internal citations omitted).

Reasonableness is analyzed by weighing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (citation omitted). The determination is to be made "from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight. . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396–97 (internal quotation marks and citation omitted). "[N]oncompliance with police directives and nonviolent physical resistance do not necessarily create 'a continuing threat to the officers' safety.'" *Estate of Ronald H. Armstrong v. Village of Pinehurst*, 810 F.3d 892, 904 (4th Cir. 2016) (citation omitted). But, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396.

Whether the force was reasonable is determined by considering the totality of the circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The extent of the plaintiff's injury is also a relevant consideration[,]" *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003), though "[p]olice officers will not be absolved of liability merely because their conduct, however unreasonable, results in only *de minimis* injury," *E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 185 (4th Cir. 2018).

Here the material facts are in dispute. Freed contends that he did not resist arrest but rather that Herndon and Shanks suddenly and without provocation forced him to the ground and struck him with their handcuffs. Once handcuffed and subdued, Freed alleges that Herndon repeatedly slammed his head into the police vehicle, while Shanks stood by, failing to intervene. The Troopers deny that the events occurred as Freed describes, and counter that they used only the amount of force necessary to effectuate his arrest; they did not strike him with their handcuffs, or slam his head into the police vehicle. Clearly, the material facts regarding Freed's arrest are in dispute, and determinations regarding credibility are not suitable at this stage of the proceedings. As such, the Troopers' Motion is denied as to Freed's excessive force claim.

iv.   First Amendment

Freed claims he was "beaten" by the Troopers in retaliation for his expressing his opinions about their conduct. (ECF 17, pp. 15, 16). "In order to state a colorable retaliation claim under Section 1983, a plaintiff 'must allege that (1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct.'" *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 479, 499 (4th Cir. 2005)) (alterations omitted). The Troopers

substantially misconstrue Freed's claim as one of retaliatory arrest and argue Freed has failed to state a claim for retaliatory arrest, as he has not pled that the Troopers were without probable cause to arrest him for failure to obey and for disorderly conduct. (ECF 23, at 12). A plaintiff who claims he was arrested in retaliation for exercising a First Amendment right must generally plead and prove an absence of probable cause for his arrest, *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019), but here, Freed claims not that the Troopers arrested him for expressing his displeasure with their handling of his 911 call, but that they struck Freed with their fists and slammed his head repeatedly into a police vehicle.[5]

These same disputed facts which preclude summary judgment on Freed's Fourth Amendment claim preclude summary judgment at this point on his First Amendment claim as well. "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers," *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987), and the Troopers do not appear to dispute that Freed's criticisms were protected speech. They do, however, dispute the gravamen of Freed's claim, that the Troopers assaulted Freed without provocation, an act which clearly has the capacity to chill protected speech. There also remains a factual dispute as to whether a causal relationship exists between Freed's strong words for the officers and their alleged violence. Freed's claim that Herndon, before slamming Freed's head into the police vehicle, told him, "you're going to respect this badge," plausibly suggests a retaliatory motivation for the alleged beating.

While the court is mindful that a meritorious qualified immunity defense requires dismissal from suit as early as possible in the litigation, *see Meyers v. Baltimore Cnty., Md.*, 713 F.3d 723,

---

[5] Thus, the Troopers' reliance on *Heck v. Humphrey*, 512 U.S. 477 (1994) is misplaced. *Heck* bars plaintiffs from stating a § 1983 claim where their success would necessarily demonstrate the invalidity of their criminal conviction and the conviction has not already been invalidated. *Id.* at 486–87. Here, were Freed to successfully prove that the Troopers assaulted him in retaliation for his criticisms of them, such a finding would not by necessity undermine the validity of his conviction for failure to obey a lawful order.

14

731 (4th Cir. 2013), the current procedural posture of this case, coupled with Freed's pro se status, potentially warrants further briefing as well as appointment of counsel for Freed, should he so move, so that the nature of his claims can be more clearly stated in an amended complaint and appropriately litigated.[6]

Conclusion

For these reasons Ortman's Motion to Dismiss (ECF 28) IS GRANTED; the Troopers' Motion to Dismiss, or in the Alternative Motion for Summary Judgment (ECF 23) is GRANTED as to Freed's due process and equal protection claims, and DENIED as to Freed's excessive force, First Amendment, and state law claims. Freed's Motion to Amend (ECF 32) is granted in part and denied in part as herein stated. Freed may file a motion to appoint counsel within 28 days of the date of this Memorandum Opinion. A separate Order follows.

___9/29/20_____                                    _____/S/_____
Date                                                              Catherine C. Blake
                                                                   United States District Judge

---

[6] Given Freed's self-represented status and the potential future appointment of counsel for Freed, the merits of Freed's state law claims against the Troopers will not be considered at this time. Despite Freed's own usage of the word "assault," the actions that Freed describes are more accurately described under Maryland law as an alleged "battery," given that Freed states that the Troopers physically applied force against his person. *See Lamb v. State*, 613 A.2d 402, 404–16 (Md. Ct. Spec. App. 1992) (detailing the relationship and distinctions between assault and battery). As the Court of Special Appeals has explained, the offense of battery is "subject to the general statute of limitations" of three years, rather than falling under the specific limitations period for "assault, libel, or slander." *Ford v. Douglas*, 799 A.2d 448, 450–51 (Md. Ct. Spec. App. 2002). Thus, the court concludes, contrary to the Troopers' arguments, that the applicable limitations period for Freed's state tort claim is three years, meaning that this action is not time-barred.

Additionally, the Troopers' contentions that they are entitled to statutory public official immunity under Md. Code Ann., Cts. & Jud. Proc. § 5-507, that Freed's claim of battery fails to state a claim, and that they are entitled to judgment as a matter of law on the state claims, shall not be analyzed at this time, but will be considered after Freed's counsel, if appointed, has had an opportunity to file an amended complaint and/or fully brief the remaining issues.